UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID JERRI, JR., et. al.           :        NO. 2:13-cv-01328-MMB
          Plaintiffs,          :
                               :
     v.                              :
                               :        HONORABLE
FREDERICK HARRAN, et. al.,          :        MICHAEL M. BAYLSON, J.
          Defendants.          :

## AMENDED CIVIL ACTION COMPLAINT

      Plaintiffs, David Jerri, Jr., and David Jerri, Sr., by and through their counsel, Brian K.

Wiley, Esq., hereby file their Amended Civil Action Complaint in accordance with this Court's

August 16, 2013 Order as follows:[1]

## PARTIES

1.  Plaintiff David Jerri, Jr. is an adult citizen of the United States, and a resident of the

    Commonwealth of Pennsylvania, residing in the County of Bucks.

2.  Plaintiff David Jerri, Sr. is an adult citizen of the United States, and a resident of the

    Commonwealth of Pennsylvania, also residing in the County of Bucks.

3.  Defendant Frederick Harran is employed as Director of Public Safety by Bensalem

    Township, a duly organized governmental entity and municipality located within the

    Commonwealth of Pennsylvania.  He is sued in both his individual and official capacities.

---

[1] In accordance with this Court's Order of August 16, 2013, Plaintiffs have endeavored in this Amended Complaint to do the following: (a) eliminate usage of the general term "defendants" and replace it with specifically-identified individual defendants as to each factual averment; (b) consolidate some claims into less counts; and (c) set forth a more concise, abbreviated version of the facts by relying on notice-based pleading rather than pleading evidence. Plaintiffs respectfully believe this Amended Complaint honors the Court's Order as it: (a) sets forth more clearly which defendants are sued under each claim; (b) consolidates the claims from 16 down to 9; and (c) substantially reduced both the page count (from 74 down to 48) and number of factual averments (by nearly 40%).

4.  Defendant Joseph DiGirolamo is employed as and serves as Mayor of Bensalem Township, a duly organized governmental entity and municipality located within the Commonwealth of Pennsylvania.  He is sued in both his individual and official capacities.

5.  Defendant Patrick Ponticelli is employed as Deputy Director of Public Safety by Bensalem Township, a duly organized governmental entity and municipality located within the Commonwealth of Pennsylvania.  He is sued in both his individual and official capacities.

7.  Defendant John Monaghan is employed as a Detective by Bensalem Township, a duly organized governmental entity and municipality located within the Commonwealth of Pennsylvania.  He is sued in both his individual and official capacities.

8.  Defendant Knights Collision Center is a duly organized business, organizing in and conducting a place of business at 2323 Byberry Road, Bensalem, PA 19020.

9.  Defendant Michael Pierson is the Owner of Knights Collision Center, a duly organized business, organizing in and conducting a place of business at 2323 Byberry Road, Bensalem, PA 19020.  He is sued in both his individual and official capacities.

<u>JURISDICTION AND VENUE</u>

10. Jurisdiction is invoked pursuant to 28 U.S.C. §1331 (federal question).  Jurisdiction is also invoked pursuant to 28 U.S.C. §1343 (civil rights) as Plaintiffs' claims arise out of the laws and Constitution of the United States of America.

11. This Honorable Court has ancillary, pendent and supplemental jurisdiction over Plaintiffs' claims arising under the Pennsylvania Constitution, and the laws of the Commonwealth of Pennsylvania, pursuant to 28 U.S.C. §1367, in that said claims arise from a common nucleus of operative fact with the claims over which this Court enjoys original jurisdiction, such that they form part of the same case or controversy.

2

12. Venue is founded upon 28 U.S.C. § 1391(b) and (c) in that Plaintiffs reside within the Eastern District of Pennsylvania and the events giving rise to this suit substantially occurred within the Eastern District of Pennsylvania.  Moreover, Defendants are all employed within and/or operate a political subdivision or governmental agency within the Eastern District of Pennsylvania where, again, the events occurred.

FACTS GIVING RISE TO CAUSE OF ACTION[2]

13. Bensalem Township is a municipality of the second-class located in Bucks County, Pennsylvania.  As a second-class township, it is governed by a mayor and a five-member council.  Defendant Joseph DiGirolamo was the Mayor at all times relevant.

14. Bensalem Township's public safety functions fall under the auspices of its Department of Public Safety, headed at all times relevant by Defendant Frederick Harran as Public Safety Director for Bensalem Township, Pennsylvania.

15. Defendant Harran, as Public Safety Director, reports to and takes direction from Defendant DiGirolamo on some matters relevant to the causes of action here presented.  Written and electronic documents, for example, reveal their communication on matters concerning the operation and personnel of Union Fire Company.

16. At all times relevant, Defendant Patrick Ponticelli was Deputy Public Safety Director for Bensalem Township, Pennsylvania.  Defendant Ponticelli reported directly to Defendant Harran.

---

[2] While Plaintiffs have carefully endeavored to honor this Court's August 16, 2013 Order and directions at oral argument to present a more concise version of the facts, Defendants clearly remain well-aware of additional relevant facts and evidence that support Plaintiffs' pleadings such that any later claim of "surprise" of facts noticed in the original Civil Action Complaint would be without merit.

17. At all times relevant, Defendant John Monaghan was employed as a law enforcement officer/Detective in the Criminal Investigations Division of the Bensalem Township Police Department, within the Department of Public Safety.

18. At all times relevant, Defendant Knights Collision Center was located at 2323 Knights Rd., Bensalem, Pa., and Defendant Michael Pierson was and remains its owner.

19. Knights Collision Center provides duty tow services to Bensalem Township Police Department, and handles all narcotics-related vehicle tows for the police. The police department and its officers, under the direction of Defendant Harran, have regular communication with Knights Collision Center and its management.

20. Union Fire Company provides fire, rescue, and EMS services to Bensalem Township.

21. Plaintiffs David Jerri, Jr. is a volunteer firefighter and has been with Union Fire Company in Bensalem, Pennsylvania for over nine (9) years. Plaintiff Jerri, Jr. had never been disciplined by Defendants and/or Union Fire Company, and had a spotless record, consistently performing his duties proficiently.

22. Plaintiff David Jerri, Sr. was a member of the Union Fire Company for ten (10) years dating between about 2002 and the summer of 2012. Prior to the events described below, Plaintiff Jerri, Sr. had only been subjected to one de minimus discipline by Defendants and/or Union Fire Company for being on the internet at the firehouse. However, following that 2006 de minimus discipline, Union Fire Company promoted Plaintiff Jerri, Sr. to Chief of the entire fire company by election of its membership.

23. As firefighters with Union Fire Company, Plaintiffs were employees of Bensalem Township at all times relevant, for the following reasons:

(A) Volunteer fire fighters with Union Fire Company, at all times relevant, received the following benefits and compensation:

• $500 stipend paid by Bensalem Township;

• Workers compensation coverage paid for by Bensalem Township;

• Workers compensation supplemental insurance paid for by Bensalem Township via state monies designated by the Township to the fire company's Relief Association;

• Disability insurance paid for by Bensalem Township; and

• Life insurance (also with monies designated by the Township to the fire company's Relief Association).

(B) While on calls, volunteer firefighters with Union Fire Company are considered Township employees under Bensalem Township's insurance policies with Delaware Valley Worker's Compensation Trust, which protects them while answering emergency calls, working in the fire station, while at training or while performing other services and duties as firefighters.

(C) Bensalem Township has automobile insurance policies that cover Union Fire Company vehicles when they respond to fire calls.

(D) Union Fire Company is funded minimally by private donations, usually falling between $14,000 and $20,000 per year, which would not even pay for its fuel bills. The majority of its funding comes from the government, with Bensalem Township, in addition to providing the aforementioned coverage, benefits, and stipends, collecting a $45 per year per resident "fire tax" to help fund its fire services.

(E) Chiefs elected to head Union Fire Company are also sworn into that position by the local district magistrate for Bensalem Township.

(F) Bensalem Township used to have a paid Fire Marshal; however, it fired him.  Rather than find a qualified replacement, Bensalem Township has left the position vacant while having Defendant Harran attend all Chiefs meetings related to the volunteer fire companies within the Township.  Meanwhile, they appointed a "Battalion Chief" to run both the paid fire department and the fire marshal's office, in lieu of an actual Fire Marshal, and require that this Battalion Chief report to Defendant Harran.

(G) Bensalem Township also applied for and received a 2009 SAFER grant in which the Township represented itself in writing as having a combination paid/volunteer fire department in order to obtain public funding.

(H) Defendant Harran has indicated in numerous public statements to multiple media outlets the Township's authority to suspend the fire company's ability to operate, and has stated that Union Fire Company must "implement the goals and objectives of the Township."

(I) Defendant Harran, in support of his and the Township's authority to direct and control the actions of Union Fire Company, has further publicly cited its alleged "failure to follow both administrative and operational directions from the Township."

(J) Defendant Harran, as detailed below, has twice shutdown Union Fire Company by order, suspended its operations, and threatened to arrest any volunteer firefighter who disobeyed the Township's shutdown of the company.

(K) Defendant Harran expressed the Township's control of Union funds, stating "you may only use fire company funds for building maintenance" and "any other use of fire company funds while your operations are suspended will result in investigation of such

6

expenditures, which could result in consequences for misuse of funds." Defendant Harran directed that any uncertain expenditures must be run by "my office for approval of the expenditure."

(L)   On at least one of those two occasions, Defendant Harran installed his own Chief to replace the Chief whose resignation he demanded, thereby bypassing an election process by the membership.

(M)   Defendant DiGirolamo created a "Union Fire Company Oversight & Advisory Committee" to which he controlled appointments to "have complete oversight and access to the operations of the Union Fire Company" including "complete, unfettered and uninhibited access to all officers and members of the Company, to all documents, records, and files of the Company" including all "bank accounts, grants, loans, notes, mortgages, leases, budgets, audits, and tax returns."

24. In addition to his firefighting, Plaintiff David Jerri, Jr. was also employed full-time as a tow truck operator for fifteen months with Knights Collision Center in Bensalem, Pennsylvania, ending in or about December 2011.  He was compensated between about $125 and $150 each day he worked.

25. Knights Collision Center provides duty tow services to the Bensalem Township Police Department, over which Defendant Harran has charge, and is the primary tow service for police narcotics calls.

26. In or about April 2011, Detective Steve Clarke of the Bensalem Township Police Department, at the direction of Fred Harran, went to Plaintiff Jerri, Jr.'s place of employment at Knights Collision Center to "question" him about an accusation being levied by Defendant Harran against Union Fire Company.

27. Following conversations between Detective Clarke and Robert Searfoss, the manager of Knights Collision and Plaintiff Jerri, Jr.'s supervisor, Mr. Searfoss informed Plaintiff Jerri, Jr. that he was <u>no longer permitted to perform duty tow for vehicles requested by Bensalem Township Police Department</u>.

28. Mr. Searfoss told Plaintiff Jerri, Jr. that this decision was being made following conversations with Detective Clarke in order to "maintain the good relationship between Knights Collision Center and Bensalem Township P.D."  Searfoss told Jerri, Jr. that he didn't want any problems from Defendant Harran.

29. Thus, as a direct result of Defendant Harran's conduct, Plaintiff Jerri, Jr. was removed from tow duties for Defendants.  The employment demotion, prompted by the actions of Detective Clarke at the direction of Defendant Harran, resulted in Plaintiff Jerri, Jr. losing overtime opportunities and increased pay, permanently.

30. Defendant Harran proceeded to shut down Union Fire Company on or about June 13, 2011, and thereby render unemployed dozens of firefighters, for what he called "safety issues."

31. Defendant Harran then leveraged the closure of Union to force out Chief Troisi, ordering that the Chief be removed before he would reopen the fire company.

32. In Chief Troisi's place, Defendant Harran installed his own handpicked "Chief."

33. After Defendant Harran forced Chief Troisi out and reopened Union Fire Company on or about June 17, 2011, his handpicked replacement was voted out by the membership of Union Fire Company in August 2011.

34. Plaintiff David Jerri, Sr. was elected Chief of Union Fire Company, and Plaintiff Jerri, Jr. was named Union's Battalion Chief.

8

35. During this period (summer 2011), Plaintiff met with Defendant DiGirolamo, along with Defendant Harran, in DiGirolamo's office.  During this meeting, Plaintiff complained that Defendant Harran's removal of Chief Troisi was motivated by political retaliation rather than "safety issues."  Plaintiff further questioned Defendant Harran's purported "safety issues" with Union Fire Company, and complained to Defendant DiGirolamo regarding government waste on a non-functional fire-training center and the interference of Defendants Harran and Ponticelli in the fire company's grant applications.

36. Defendant DiGirolamo had little response to Plaintiff's complaints and would continually look over to Defendant Harran to speak for him in response.  Defendant DiGirolamo took no remedial action on Plaintiff's complaints.

37. In an effort to address Defendant Harran's "safety concerns" with the company, Chief Jerri, Sr. requested of Defendant Harran a written list of the "safety issues" for which Defendant Harran purportedly earlier closed the fire company.  Defendant Harran refused.

38. Plaintiff Jerri, Sr. attended a Bensalem Township Council Meeting in August 2011 and complained of Defendant Harran's refusal to disclose the "safety issues" used to close the fire company so that Plaintiff Jerri, Sr. could address them.  He raised the pre-textual nature of Defendant Harran's "safety issues" in shutting down the fire-company.

39. Present at this meeting for the complaint and request were Defendant DiGirolamo (the mayor) and the Township Council, comprised of Misters Kisselback, Pilieri, Belfield, Knowles, and Mathieu.

40. Mr. Kisselback, as Council President, refused to discuss Plaintiff Jerri, Sr's concerns, cutting him off and instructing Plaintiff Jerri, Sr. to make an appointment with Defendant DiGirolamo to discuss the specifics of Plaintiff's complaint.

9

41. When Mr. Kisselback then claimed not to know what Plaintiff was talking about, Plaintiff Jerri, Sr. offered to give him specifics, upon which Mr. Kisselback again ordered Plaintiff to call Defendant DiGirolamo and talk to him instead, dismissing Plaintiff with a "that's it."

42. Defendant DiGirolamo heard the Township Council direct Plaintiff Jerri Sr. to speak with him about the matter, and so told Plaintiff to "call my office and make an appointment."

43. Plaintiff Jerri, Sr. followed these directions and called Defendant DiGirolamo's office the next day to make the appointment.  However, Defendant DiGirolamo never returned his call.

44. Instead, immediately after making the call as instructed by council and the mayor, Defendant Harran contacted Plaintiff Jerri, Sr. and ordered Plaintiff not to call the mayor's office any more for an appointment.  Defendant DiGirolamo never returned Plaintiff's call, and this direction from Defendant Harran to stop calling was the only response Plaintiff received to his complaint regarding Harran's refusal to disclose the alleged "safety concerns."

45. Defendant Harran ordered Plaintiff Jerri, Sr. that he was no longer permitted to go to the Bensalem Township Council Meetings to address issues between Union Fire Company and members of the township government such as Harran and Defendant DiGirolamo.

46. Defendant Harran directed Plaintiff Jerri, Sr. to henceforth direct all issues and complaints regarding him and his decision to shut down the fire company to a new advisory board Defendant DiGirolamo would be setting up to hear Plaintiff's complaints, and to do so only in private.  Plaintiff Jerri, Sr. was ordered not to speak publicly or attend council meetings.

47. Defendant DiGirolamo then created the "Union Fire Company Oversight and Advisory Committee," establishing his direct control over "five (5) members appointed by the Mayor of the Township of Bensalem," with reappointment at his sole discretion.

10

48. Defendant DiGirolamo granted his advisory board "complete, unfettered and uninhibited access to the operations of the Union Fire Company" including "complete, unfettered and uninhibited access to all officers and members of the Company, to all documents, records, and files of the Company, and to all meetings" of its membership and officers.

49. Defendant DiGirolamo directed that his advisory board investigate the command structure, decision-making, membership, and personnel of Union Fire Company, and have unfettered access to its "bank accounts, grants, loans, notes, mortgages, leases, budgets, audits, and tax returns."

50. Defendant DiGirolamo directed that the advisory board make findings and recommendations "to the Mayor of the Township of Bensalem and the Director of Public Safety for the Township of Bensalem."

51. Defendant DiGirolamo directed that the advisory board "shall report regularly to the Mayor and Director of Public Safety at such intervals as requested by the Mayor as to the Committee's findings and recommendations."

52. Finally, Defendant DiGirolamo declared the following: "The Township, through the Mayor and/or Director of Public Safety, shall thereafter direct and/or advise, as the case may be, the Company in regard to any and all aspects of the operations of the Company."

53. Defendant DiGirolamo appointed none other than Defendant Harran himself, the very subject of Plaintiff's complaints, as head of the advisory board.  Defendant DiGirolamo, by the above edicts, gave Defendant Harran the ability to direct "all aspects of the operations of the Company."

54. When the list of reasons for closing Union finally emerged months after it had been repeatedly requested, Defendants DiGirolamo And Harran refused to discuss it with Union Fire Company and refused to communicate with Plaintiff Jerri, Sr.

55. Plaintiff Jerri, Sr. expressed his concerns to Defendant Harran (head of DiGirolamo's "advisory board") with the lack of communication regarding the safety issues Defendant Harran purportedly had with the company's operation, and repeated his concerns that Chief Troisi was removed as Chief solely for political and personal reasons unrelated to the safe operation of the fire company.  Defendants DiGirolamo and Harran failed to provide any answers or respond to Plaintiff's questions and concerns in this regard.

56. Then, at the September 2011 Township Fire Chiefs' meeting, Defendant Deputy Public Safety Director Pat Ponticelli threatened Plaintiff Jerri, Sr. with arrest if Plaintiff spoke to the public or to the press regarding public safety issues in Bensalem Township.

57. Defendant Ponticelli specifically ordered Plaintiff not to speak publicly and not to talk to the press about his complaints of waste, safety issues, misconduct, and violations of the law.

58. Defendant Ponticelli then threatened Plaintiff: "If I had my way, I'd take you out back and settle this now."  Plaintiff was thus threatened with arrest and with a beating for exercising his speech rights.

59. In the months that followed, Plaintiff Jerri, Sr. lodged both written and verbal complaints and voiced his concerns to Defendants DiGirolamo and Harran (including via the advisory board created by the former, headed by the latter, and reporting to both) on the following subject-matters: public safety issues, emergency response times in the community, the removal of township personnel for political and personal rather than performance-based reasons, the interference with and attempted sabotage by township officials of federal grant awards,

12

misinformation promulgated by township officials to the federal government, false

information intentionally recorded in grant applications, the misappropriation of federal

grant funds in the township budget, the waste of taxpayer funds on a non-functioning and

unneeded training center, harassment by public officials of a disabled employee, admittedly

false requests for confidential and private medical information of an employee by township

officials, violations of the Americans With Disabilities Act, demands for unlawful

terminations by township officials, violations of the Garcia Act, the failures of multiple

elected public officials and appointees to address these concerns and take appropriate

remedial action, use of government resources to fabricate a prosecution for strictly personal

and political motivations, and retaliation against those who complained of the above using

taxpayer-funded government resources and the police force.  Plaintiff Jerri, Sr. also voiced

concern over Defendant Harran's actions with respect to withholding arson information

while Chief Troisi was in charge.  Defendants Harran and DiGirolamo provided no response

or answers.

60. Persons who were the subject of Plaintiffs' accusations of misconduct, illegality, fraud, and

waste included Defendants Harran, DiGirolamo, and Ponticelli.  Defendant Ponticelli, for

example, was accused of interfering with and attempting to sabotage a federal grant being

awarded the fire company, including providing false information to federal authorities in an

attempt to quash the grant that was ultimately awarded despite his attempts.

61. Plaintiff Jerri, Sr.'s complaints and reports of waste, illegality, misconduct, and fraud were

made not only to Defendants Harran and DiGirolamo but to county, state, and federal

officials when the "advisory board" and these Defendants failed to respond.  For example, he

13

contacted the Bucks County Controller's Office, the FBI, Bensalem Township Auditor, and the Pennsylvania State Fire Commissioner.

62. By November 2011, three months after Defendant Harran had ordered Plaintiff Jerri, Sr. that he was not to speak publicly, call the mayor, or address any concerns to the public or to council, but was rather to steer all complaints to him and Defendant DiGirolamo's "advisory committee," the "advisory committee" had still not spoken to Plaintiff.

63. In fact, the advisory committee's only response to Plaintiff's inquiries (which he was ordered to direct to them) was the same as Defendant DiGirolamo: they refused to talk about it. Rather, they stated "that's past history, we are moving forward," refusing to discuss or address any of Plaintiff Jerri, Sr's concerns and complaints.

64. Finally, in January, three members of the mayor's "advisory committee" met with Plaintiff Jerri, Sr. and members of Union Fire Company.  They promised to bring Plaintiff's complaints and concerns to Defendant DiGirolamo.  Defendant DiGirolamo never responded, and instead ignored and failed to respond to and correct each complaint.

65. Plaintiff Jerri, Sr.'s complaints and reports were made between August 2011, when he was elected Chief, throughout the fall of 2011 and into the winter of 2011-12, during the same time period that his son Plaintiff Jerri, Jr. was suffering from a fire call injury and receiving workers compensation.

66. That is, on September 17, 2011, Plaintiff Jerri, Jr. was injured on a fire call and taken by ambulance from the fire to Aria Hospital in Philadelphia, PA for treatment.

67. Multiple firefighters witnessed Plaintiff Jerri, Jr. injure his hand, observing its swollen condition immediately on scene at the fire call before he was placed in the ambulance.

68. At Aria Hospital, Plaintiff Jerri, Jr. was diagnosed with a fractured hand.  His hand was splinted, and for several months thereafter, Plaintiff Jerri, Jr. was medically restricted by his treating physicians and hand specialists from using his right hand.  Plaintiff underwent surgery on the hand in October 4, 2011, and was seen post-operatively until December 2011.

69. The day following his injury, Plaintiff informed his private employer, Defendant Knights Collision Center, Inc., that he would not be into work on Monday, September 19, 2011, explaining how he was injured on the fire call to which he responded as a volunteer firefighter.

70. On September 19, 2011, Plaintiff Jerri, Jr. went to Defendant Knights Collision Center, Inc. and gave them his medical paper work in person, explaining (again) his injury and how it happened.

71. According to sworn testimony offered by the owner of Knights Collision Center, Defendant Pierson, by September 19, 2011 Plaintiff Jerri Jr. had told him that he was hurt responding to the fire and that he was going out on workers compensation because he got hurt.

72. Further, Defendant Pierson testified under oath that in accordance with this information provided by Plaintiff Jerri, Jr. he took Jerri Jr. off the schedule for Knights Collision Center.

73. Plaintiff Jerri, Jr. did in fact file a claim for Workers Compensation.

74. For approximately two months thereafter, he was paid workers compensation benefits via Delaware Valley Workers Compensation Trust, who pays the claims for Bensalem Township.

75. Linda Bengera, the claims adjuster for Delaware Valley Workers Compensation Trust who handled Plaintiff Jerri, Jr.'s claim has testified under oath that she spoke with Defendant

15

Knights Collision Center, Inc., identifying who she was and that the purpose of her call was investigating the workers compensation claim.

76. She further testified that she sent Defendant Knights Collision Center, Inc. a statement of wages form pertaining to Plaintiff Jerri, Jr. to ascertain the amount of compensation he would be paid.

77. Then, in November 2011, Defendant Harran stated in the presence of witnesses that Jerri, Sr. should resign as Chief of Union Fire Company because "he's going to be too busy with his son's defense."  As Plaintiff Jerri, Jr. had not been charged with any crimes, Plaintiff Jerri, Sr. was unsure of what Defendant Harran spoke of and was confused by the meaning of an "upcoming defense."

78. Defendant Harran's foreshadowing of an upcoming defense that would necessitate Jerri, Sr.'s resignation came in the middle of Plaintiff Jerri, Sr.'s vocal complaints of government waste, illegality, and misconduct in Bensalem Township.

79. On or about December 15, 2011, Plaintiff Jerri, Jr. learned that his workers compensation benefits were being stopped.  He called and spoke with Linda Bengera, who was unable to provide him with an explanation.

80. Later testimony by Linda Bengera revealed that her supervisor had received a call from Defendant Harran, whereupon she (Bengera) was directed to cut off Plaintiff Jerri, Jr.'s benefits and deny them.

81. Indeed, Linda Bengera testified that the sole basis for her denial of the benefits was the conversation her supervisor had with Defendant Harran.  But for Defendant Harran's phone call, the benefits would have continued.

82. Bengera testified under oath that she never reviewed the records of or spoke to anyone at Aria Hospital, where Plaintiff was taken to be treated for his injury the day it occurred.  In fact, she could not confirm that she based the denial on *any* review of medical records other than a list of missed appointments.

83. When pressed on whether she spoke to anyone at all other than Defendant Harran in denying the claim and making the determinations recorded on the denial letter, **she stated under oath "I believe it was just Fred."**  After acknowledging that "Fred spoke with my supervisor," **she testified she denied the claim after only speaking to her "supervisor and Fred."**

84. Plaintiff later received a denial letter from Delaware Valley Workers Compensation Trust, in which Bengera lists the reasons for the denial as follows: "the employee did not suffer a work-related injury" and "the injury was not within the scope of employment."

85. Of note, the letter sent by Bengera denying Plaintiff Jerri, Jr.'s benefits following the call from Defendant Harran **was dated December 7, 2011**.

86. The denial letter, caused according to Bengera's sworn testimony by the direction of Defendant Harran, was issued <u>before anyone from Bensalem Township Police Department interviewed several of the "witnesses" it would ultimately produce against Plaintiff at trial regarding its claim of insurance fraud</u>.  That is, comparing the timeline to *Defendants' own police reports*, Defendants Harran, Ponticelli, and Monaghan did not obtain medical records, review any documents, nor conduct interviews of several witnesses they later used to try to corroborate their claims of a faked injury until <u>after</u> the December 7, 2012 letter was already generated, *<u>after Harran made the call to terminate the benefits</u>* and foreshadowed a coming resignation-inducing prosecution.

17

87. Indeed, Plaintiff Jerri, Jr.'s supervisor at Knights Collision was not interviewed for more than a week after the denial letter was issued.  In fact, some witnesses were not even interviewed until July of 2012.

88. Moreover, in at least three instances known at this time, Defendant Monaghan failed to document interviews he conducted of eyewitnesses to Plaintiff Jerri, Jr. injuring his hand at the fire scene.  In one such interview, he threatened an eyewitness with arrest if that eyewitness did not corroborate the narrative Defendants Harran, Ponticelli, and he were creating, trying to coax him into false testimony by stating that Plaintiff Jerri, Sr. "is mentally unstable" (despite the interview purportedly being about Jerri, Jr. not Sr.).

89. Plaintiffs are unaware of any police reports that were ever created or produced to the Bucks County District Attorney's office documenting Defendant Monaghan's intimidation and attempted coercion of an eyewitness to provide false testimony, and of interviews of a second and third eyewitness who corroborated Plaintiff Jerri, Jr.'s account.  These eyewitness interviews were clearly exculpatory and were conducted by Defendant Monaghan prior to Plaintiff Jerri, Jr.'s trial; yet, no such exculpatory reports were ever produced or turned over in discovery to Plaintiff Jerri, Jr.'s defense counsel.

90. In other instances, Defendants Monaghan, Harran, and Ponticelli willfully and knowingly failed to interview witnesses who were available to provide information proving Plaintiff Jerri, Jr.'s injury occurred during the fire call, despite knowing of their existence.

91. Defendants Monaghan, Harran, and Ponticelli also willfully and knowingly failed to obtain and review medical records of Plaintiff Jerri, Jr.'s injuries and treatment.

92. Defendants Monaghan, Harran, and Ponticelli also failed to speak with any of Plaintiff Jerri, Jr.'s physicians.

93. It was later learned that Defendant Monaghan had spoken with Plaintiff Jerri, Jr.'s employer, Defendant Pierson, and his supervisor Robert Searfoss, and concocted a story about Plaintiff allegedly injuring himself at a hockey game rather than the fire call from which he was transported by ambulance.

94. In a later newspaper article published in November 2012, Defendant Harran indicated that he personally handpicked Defendant Monaghan to handle the case against Plaintiff Jerri, Jr.

95. Defendant Monaghan stated in the presence of witnesses at Plaintiff Jerri, Jr.'s later trial that Defendant Harran "hand-picked me" for the case and "is breathing down my neck for it."

96. While still out on workers compensation, Plaintiff Jerri, Jr. was also told by Defendant Monaghan that he was terminated from Knights Collision Center.

97. Plaintiff never heard any such thing from his actual employer, Defendant Knights Collision Center, Inc., and believed himself protected while out on Workers Compensation and under state laws protecting volunteer fire fighters who are injured in the line of duty. He told Defendant Monaghan the same.

98. Nevertheless, Defendant Monaghan told him "you've been fired." Plaintiff Jerri, Jr. immediately thought of his prior removal from Bensalem Township tow calls following Detective Clark's conversation with Knights Collision Center earlier in the year. He recalled his supervisor's statement that he needed to maintain a good relationship with the Township and didn't want problems from Defendant Harran.

99. Not trusting Defendant Monaghan's word, Plaintiff Jerri, Jr. later contacted Defendant Knights Collision Center, Inc. when he was medically cleared to return to work by his physicians. He was told "we no longer need you." Defendant Knights Collision Center, Inc. never permitted Plaintiff to return to his job and terminated him while he was out on medical

19

leave on workers compensation and while injured due to his participation in a fire call as a volunteer firefighter.

100.    According to police reports, in early December 2012, Defendant Pierson admitted to terminating Plaintiff Jerri, Jr. back in September, in the midst of his ongoing medical treatment and while out on workers compensation.  Pierson is quoted as telling police "Jerri was an employee until some time in September," "Jerri picked up his last pay check and left the business," and "as far as [I'm] concerned Jerri abandoned his job with Knights Collision and was no longer an employee."

101.    In January 2012, Defendants charged Plaintiff Jerri, Jr. with the January 22, 2012 "burglary" of his own car from Knights Collision Center, Inc. when he retrieved it following his termination notice from Defendant Monaghan and Knights Collision Center, Inc., a termination Defendant Pierson has admitted occurred "in September."

102.    At his February 2012 arraignment on this "burglary" charge, Defendant Monaghan stated within the hearing of multiple persons that **"this is a highly political case"** and "we're looking at him for insurance fraud."  Defendant Monaghan also spoke aloud that Plaintiff Jerri, Jr. **"is one of the 'jerk offs' from the fire company causing all the problems."**

103.    In March 2012, Plaintiff Jerri, Jr. was able to plead guilty to misdemeanor "agricultural trespasser" in negotiation with the District Attorney's Office for the incident where he retrieved his own car from his employer's parking lot.  The judge imposed probation, saying that it could even be closed early if it was deemed no supervision was necessary.

104.    Not satisfied with this outcome, Defendant Monaghan within days swore out an affidavit in support of false charges against Plaintiff Jerri, Jr. filed on March 7, 2012.  Those charges

included felony Insurance Fraud, Theft by Unlawful Taking or Disposition, and Receiving

Stolen Property.

105.    Plaintiff Jerri, Jr. was entered into NCIC as wanted, with extradition approved for

adjacent states.  Upon turning himself in, Defendants processed Plaintiff Jerri, Jr., placed him

into a holding cell for four hours, and arraigned him.  He was remanded to the Bucks County

Correctional Facility in lieu of $50,000/10% bail where he spent three (3) days incarcerated

before Plaintiff Jerri, Sr. could gather sufficient money to post his son's bail.

106.    While incarcerated on these charges, Plaintiff Jerri, Jr. endured solitary confinement

away from general population in a small cell.

107.    As a result of the charges, Plaintiff Jerri, Jr. was also suspended from Union Fire

Company for the eleven months that followed.

108.    Following his arrest, Defendants Harran and Ponticelli, along with Detective Aninsman,

told multiple media outlets, including the Bucks County Courier Times and CBS, that

Plaintiff Jerri, Jr. was lying about his injury.  These statements were then repeated in

multiple, additional media outlets including KYW, Philly Fire News, Bensalem Patch,

Firehouse.com, and Bucks County Fire.

109.    Detective Aninsman is quoted as stating "a police investigation found that he injured his

hand either playing hockey or while working for his now former employer."

110.    After these public statements, Plaintiff Jerri, Jr. was publicly ridiculed on the internet,

including on sites run by Bensalem Patch, Philly Fire News, KYW, and the Courier Times,

and had difficulty finding employment.

111.    During this same time period, between September 2011 and the spring of 2012, Plaintiff

David Jerri, Jr.'s mother and brother were stalked by an unknown investigator working

for Bensalem Township, Plaintiff Jerri, Sr. was stalked by a uniformed officer on his way to work, Plaintiff Jerri, Sr.'s car was searched without a warrant by Defendant Harran's officers, and the Jerri family home was twice searched by Harran's armed, uniformed officer in the presence of small children.

112.   Moreover, Defendant Harran had placed an electronic "Wanted" billboard on Interstate 95 right outside of Plaintiff Jerri, Sr.'s full-time employment.  The billboard featured his name, which is the same as his son's, without the suffix, and a picture of his son, declaring "David Jerri" wanted on an arrest warrant for insurance fraud.  Plaintiff Jerri, Sr.'s co-workers saw the billboard and believed it was for him.

113.   Additionally, Defendants Harran, Ponticelli, and Monaghan publicly labeled Plaintiff Jerri, Sr. "incompetent" and "a danger to Bensalem Township."  An inter-departmental email was circulated within Bensalem Township Police Department claiming falsely that Plaintiff Jerri, Sr. threatened to shoot police officers on sight and should be considered a danger to law enforcement.

114.   Defendant Monaghan further publicly called Plaintiff Jerri, Sr. "mentally unstable."  Such statements circulated in the Philadelphia Inquirer, Bucks County Courier Times, and at a public meeting at Pen Ryn Mansion.

115.   In July 2012, with the insurance fraud charges still pending, Defendant Harran shut down Union Fire Company for a second time and demanded Plaintiff Jerri, Sr. resign as Chief of Union Fire Company before he would allow the company to resume operating. Plaintiff Jerri, Sr. was forced out of his position by Defendant Harran, who refused to reopen Union Fire Company unless its *elected* leadership was replaced . . . again.

116.   Defendant Harran backed up the forcing of Plaintiff's resignation by withholding the insurances necessary for the Union Fire Company to operate safely, including refusing to provide workers compensation, disability, and automobile protection.  He also threatened to arrest any member of Union Fire Company found responding to assist a fire call, telling them they were "suspended" effective immediately.

117.   Defendants made it an explicit condition of reopening the fire company and allowing its members to work that Plaintiff Jerri, Sr. step down.

118.   On letterhead naming both Defendants DiGirolamo and Harran, Defendant Harran provided a copy of Defendant DiGirolamo's "advisory board" report in which he recommended "removal and replacement of executive leadership specifically the President and Chief as approved by the Township."  The report concludes that if this recommendation is not "realized within 30 days of the issuance of the suspension, then the Committee recommends that the suspension be changed to a permanent discontinuance of operations and suspension of funds."

119.   Notably, the report also recommended that an "overseer" be appointed over the Township's fire companies . . . "directly under the Public Safety Director," (i.e., Defendant Harran).

120.   Email communications from this time reveal Defendant DiGirolamo's direct involvement in these decisions and in leveraging "problems" with the fire-company to obtain changes to its command structure and leadership.  For example, emails reveal it was Defendant DiGirolamo who was the final decision-maker on when the fire-company would reopen. Indeed, in at least one email, the President of Union Fire Company literally begs the Mayor directly to reopen the fire-company.  Defendant Harran also confirms in emails his

23

ongoing communications with the mayor concerning the closure and reopening of the fire company.

121. After ousting Plaintiff Jerri, Sr., Defendants DiGirolamo and Harran also required a "Remediation and Re-alignment Plan" be submitted to both of them, with the plan's effective date being "immediately upon <u>approval of the Mayor</u>."

122. As the trial of Plaintiff Jerri, Jr. approached, Defendants Ponticelli and Monaghan instructed Plaintiff Jerri, Sr. that if his son, Plaintiff Jerri, Jr., did not plead guilty to the false charges, he (Sr.) would be arrested.

123. Plaintiff Jerri, Jr.'s attorney, Louis R. Busico, Esquire, advised both Plaintiffs not to accept Defendants' attempt to dismiss one set of falsified charges for a plea to a second set of falsified charges.

**124.** On November 9, 2012, following a waiver (bench) trial, Plaintiff Jerri, Jr. was **acquitted of all charges.**

125. Defendant Monaghan, who during the trial attempted to produce witnesses to swear to his false charges but who never disclosed or reported the existence of interviews he conducted of several exculpatory witnesses, immediately got on his phone and called his superiors with the news that it had not worked.

126. During the trial, firefighters who Defendant Monaghan either never bothered to interview or whose interviews he failed to document testified that they observed the injury to Plaintiff Jerri, Jr.'s hand at the fire call and saw its swollen condition before he was placed in the ambulance to be transported to the hospital.

127. As a result of the false prosecution, defamation, and termination, Plaintiff Jerri, Jr.'s reputation as an honest citizen and volunteer firefighter was severely tarnished.  He

24

suffered embarrassment, shame, and much emotional and mental stress.  He does not feel safe, feared traveling in his own home town, could not sleep, and watched as his relationship with his father and girlfriend suffered.

128.   As a further result of this conduct, members of the fire service and the general public commented on the statements they read about Plaintiff Jerri, Sr. in the newspaper, on TV, and on internet sites, spreading negative impressions of Plaintiff Jerri, Sr. based on the comments of Defendants Harran, Ponticelli, and Monaghan.  The continuous supply of defamatory statements by these three Defendants resulted in his loss of friendships, loss of trust in him, and the distancing of his supports, as well as embarrassment, humiliation, and disrepute within his professional community.  Plaintiff Jerri, Sr. also suffered lost affection and increased tension between he and his wife.

129.   Plaintiff Jerri, Sr. is receiving ongoing treatment by a medical professional for anxiety and stress related disorders resulting from Defendants' treatment of him, and the aftermath of their actions against him, his son, and his family.

130.   He has also suffered loss of appetite, difficulty sleeping, and lost energy.

131.   Plaintiff Jerri, Sr. was also ostracized among firefighters from other communities, who point to him as "that guy," whisper and joke among each other at his and his son's expense, and avoid talking to him, many times at job interviews.  Fire instructors at classes Plaintiff Jerri, Sr. has taken have since joked about him in front of the class.

132.   In the midst of all of the above, Plaintiff Jerri, Sr. told Defendant Harran that he and the other-named Defendants were violating his civil rights out of a personal and political vendetta against he and his family because of his complaints of waste, misconduct, unlawful actions and retaliation.

25

133.   Plaintiff Jerri, Sr. told Defendant Harran that Harran had no right to dictate to, retaliate, and harass the members of Union Fire Company and to maliciously interfere with the services it provides to the Bensalem community.  Nor did he have a right to tell Jerri, Sr. to keep his mouth shut and order him not to speak publicly.

134.   Defendant Harran's response? "I am Bensalem.  **I** run things here," adding that if Jerri didn't like it, "Sue me.  I get free parking at the federal courthouse."

COUNT I-
42 U.S.C. § 1983
(Fourth and Fourteenth Amendments: malicious prosecution and false arrest)
**Plaintiff: David Jerri, Jr.**
**Defendants: Harran, Ponticelli, and Monaghan**

135.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

136.   Defendants Harran, Ponticelli, and Monaghan of the Bensalem Township Department of Public Safety directed the initiation of a criminal proceeding against Plaintiff David Jerri, Jr., by way of filing a criminal complaint sworn out by Defendant Monaghan, CR-176-12, in Pennsylvania Magisterial District Court MDJ-07-1-01.  They thereby obtained a warrant, arrested Plaintiff, and Defendants Ponticelli and Monaghan attended a hearing on the criminal complaint they filed, pursuing it by presenting evidence, calling witnesses in support of it, and requesting that the charges be bound over for trial in the Bucks County Court of Common Pleas.

137.   Defendants Harran, Ponticelli, and Monaghan initiated the criminal proceedings against and arrested Plaintiff David Jerri, Jr. without probable cause in that they knew that the evidence and testimony they presented in support of the charges was intentionally fabricated, unsubstantiated, and incomplete.

138.   Defendants Harran, Ponticelli, and Monaghan further failed to disclose exculpatory
       evidence to the district magistrate and to prosecutors, made false and misleading reports
       relied upon by the issuing authority and prosecutors, omitted material information from
       their reports to prosecutors, exerted pressure upon a young and inexperienced prosecutor
       to argue charges ill-supported by facts and evidence, and otherwise interfered with the
       issuing authority and prosecutor's ability to exercise independent judgment.  Most
       importantly, they just plain <u>lied</u>.

139.   Defendants Harran, Ponticelli, and Monaghan acted with malice; that is, they intended
       that Plaintiff David Jerri, Jr. be both incarcerated on and convicted of crimes they knew
       he did not commit, based on evidence they knew was fabricated and withholding
       exculpatory information they knew was not, with the express intent of punishing his
       father for the father's public opposition to their misconduct, waste, and legal violations.
       Said malice against Plaintiff was also for his father's reports of unlawful retaliation
       against him in his employment as Chief of Union Fire Company and against Plaintiff in
       his employment with Knights Collision Center, Inc.  Their conduct was therefore not
       motivated by justice, but rather was political punishment.

140.   Defendants Harran, Ponticelli, and Monaghan's conduct in presenting false and
       fabricated charges against Plaintiff David Jerri, Jr. fell outside of the scope of their duties
       as said conduct of knowingly prosecuting someone for a crime they did not commit is
       not, and cannot in anyway be said to be, the duty or office of these Defendants.
       Moreover, their actions themselves constitute criminal acts, fraud, actual malice and
       willful misconduct.

141. Defendants Harran, Ponticelli, and Monaghan's conduct would have been clearly unlawful to reasonable officers in Defendants' situations. That is, it would be clear to a reasonable officer that conduct such as this violates clearly established law.

142. The false and malicious proceedings instituted by Defendants Harran, Ponticelli, and Monaghan against Plaintiff David Jerri, Jr. terminated in favor of Plaintiff. That is, Plaintiff David Jerri, Jr. was acquitted of all charges against him following a waiver (bench) trial.

143. Plaintiff was so acquitted by the Court despite the dogged efforts of Defendants Harran, Ponticelli, and Monaghan to frame him and knowingly present false, fabricated, and incomplete evidence out of purely retaliatory and political motivations.

144. As a result of their conduct, Plaintiff suffered a deprivation of liberty when he was arrested and seized. Plaintiff was taken into custody by warrant on the charges and was remanded in lieu of bail to the Bucks County Correctional Facility where he spent four days incarcerated. Plaintiff was additionally required to post a bond and paid monetary bail to be released. Accordingly, his liberty was restrained pre-trial.

145. Defendants Harran, Ponticelli, and Monaghan's conduct violated Plaintiff's civil rights under 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

146. WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, equitable relief including reinstatement and restoration of employment, and any other equitable remedy that the Court deems reasonable and just. Plaintiff further requests a declaratory

judgment issue against Defendants Harran, Ponticelli, and Monaghan declaring their

conduct unlawful, unbecoming of officers of the law, and in violation of Plaintiff's civil

rights.

COUNT II-
42 U.S.C. § 1983
(Fourteenth Amendment: Deprivation of Liberty-Interest in Reputation)
**Plaintiffs: David Jerri, Jr. and David Jerri, Sr.**
**Defendants: Harran, Ponticelli, Monaghan, DiGirolamo**

147.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

148.   Plaintiffs were employees of Bensalem Township ala their positions with Union Fire

Company as set forth in paragraphs 19 through 22 above.

149.   Additionally, decisions were made with respect to their employment as firefighters with

Union Fire Company and with Knights Collision Center, Inc. at the direction, behest, and

orders of Defendants Harran and DiGirolamo, both of whom are state actors.

150.   Bensalem Township had a policy, practice, or procedure concerning workplace

harassment and retaliation.

151.   Bensalem Township also had a policy, practice, or procedure concerning employee

discipline, including demotions and termination.

152.   Bensalem Township finally had a policy, practice, or procedure concerning the

investigation of suspected criminal conduct and the filing of criminal charges based on

criminal investigations.

153.   Despite these policies, practices, and procedures, and in derogation of them, beginning in

the fall of 2011 and continuing through November 2012, Defendants Harran, Ponticelli,

Monaghan, and DiGirolamo created, disseminated, and reinforced a false and defamatory

impression concerning both Plaintiff Jerri, Jr. and Plaintiff Jerri, Sr. in connection with

29

their employments and ultimate demotions and terminations.  Defendant DiGirolamo also participated directly, along with Defendant Harran, in the termination of Plaintiff Jerri, Sr.'s employment.

154.   Defendants Harran, Ponticelli, and Monaghan publicly published statements casting Plaintiff Jerri, Jr. as a criminal and an insurance cheat, casting his as dishonest and untrustworthy, claiming that he had falsely claimed injury while responding to a fire call and illegally collected workers compensation for that injury.

155.   Said statements concerning Plaintiff Jerri, Jr. would be reasonably taken by the average person, including his coworkers, peers, and prospective employers, to impute upon Plaintiff criminal wrongdoing, of a serious enough nature to warrant felony charges and incarceration, as well as deceitfulness, dishonesty, and other moral turpitude.

156.   These publications were substantially and materially false, for the simple reason that, as made a finding by the Bucks County Court of Common Pleas, Plaintiff did injure himself while responding to a fire call, and for the reason that his collection of workers compensation as a result thereof was not illegal.

157.   Defendants Harran, Ponticelli, and Monaghan also publicly published statements concerning Plaintiff Jerri, Sr. and his employment that he was "mentally unstable," a danger to police officers, "incompetent," not competent to be Chief of Union Fire Company, and "a danger to Bensalem Township."

158.   Said statements concerning Plaintiff Jerri, Sr. would be reasonably taken by the average person, including his coworkers, peers, and prospective employers, to impute upon Plaintiff mental instability, incompetency, dangerousness, and moral turpitude.

30

159.  Said statements were false and were made for the purely political and personal motives of those making them, retaliation against the Jerri family for Jerri, Sr.'s engagement in protected speech activity that implicated Defendants in waste, illegality, and wrongdoing.

160.  Defendant DiGirolamo was personally involved in reinforcing this defamatory impression of Plaintiff Jerri, Sr.  He both reinforced it by directly participating in terminating Plaintiff, Sr., utilizing his self-created, autocratic "advisory board" over which he appointed Defendant Harran head, and via his sanctioning of Defendant Harran's retaliation in the midst of the creation and dissemination of the impression of Plaintiff as unstable, incompetent, and dangerous.

161.  The publication of these substantial and material falsehoods concerning both Plaintiffs was done knowingly and with deliberate indifference to their lack of veracity, being politically and personally motivated retaliation against the Jerri family for Jerri, Sr.'s engagement in protected speech activity implicating these same Defendants in waste, illegality, and wrongdoing.

162.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo's actions in this regard infringed upon the reputation, honor, and integrity of Plaintiffs.

163.  These Defendants also demoted Plaintiff Jerri, Jr. at Union Fire Company and terminated him at Knights Collision Center following their creation and dissemination of the false and defamatory impression, and as part of it, using their authority and power as state actors.  The stigma they created was thus accompanied by and reinforced by their demotion of and ultimate termination of Plaintiff Jerri, Jr. from his employment.

164.  Moreover, these Defendants forced Plaintiff Jerri, Sr.'s resignation following their creation and dissemination of the false and defamatory impression, and as part of it, and

leveraged the false prosecution of his son and mistreatment of his family to compel it. The stigma they created was thus accompanied by and reinforced by their adverse employment actions against Plaintiff Jerri, Sr.

165.   Said conduct by Defendants Harran, Ponticelli, Monaghan, and DiGirolamo deprived Plaintiffs of their protected liberty interest in their reputations without due process.

166.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo were acting under color of state law at the time they so deprived Plaintiffs of their protected liberty interest in their reputations.

167.   Each of the named Defendants either personally participated in these publications and violations of Defendants' policies, practices, or procedures, or had actual knowledge and acquiesced in said conduct (on notice, they both explicitly and tacitly sanctioned the defamatory impression and termination).

168.   As a result of these Defendants' conduct, Plaintiffs suffered injuries including damage to their good name and reputation and ultimately, termination, thus depriving them of employment.  Plaintiffs also suffered injury to potential future employment as Defendants' charges against and statements they made about Plaintiffs are reasonably likely to damage their standing and associations in the community by implying that Jerri, Jr. engaged in criminal wrongdoing, dishonesty, fraud, and other moral turpitude, and Jerri, Sr. is incompetent, mentally unstable, and a danger to the community.

169.   WHEREFORE, Plaintiffs pray for the following relief: Plaintiffs demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, equitable

32

relief including reinstatement and restoration of employment, and any other equitable remedy that the Court deems reasonable and just.

COUNT III-
42 U.S.C. § 1983
(First Amendment - Retaliation)
**Plaintiff: David Jerri, Sr.**
**Defendants: Harran, Ponticelli, Monaghan, and DiGirolamo**

170.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

171.   Plaintiff was an employee of Bensalem Township ala his position with Union Fire Company as set forth in paragraphs 19 through 22 above.

172.   Additionally, decisions were made with respect to his employment as a firefighter with Union Fire Company at the direction, behest, and orders of Defendants Harran and DiGirolamo, both of whom are state actors.

173.   Plaintiff Jerri, Sr. engaged in the protected activity of protesting publicly waste, misconduct, and violations of the law by public officials and employees of Bensalem Township, as well as the resulting retaliation taken against him and his family by these same individuals for these reports.

174.   Said matters of which Plaintiff Jerri, Sr. spoke and complained, namely the waste, misconduct, illegality, and retaliation by government officials, including Defendants Harran, Ponticelli, Monaghan, and DiGirolamo, were matters of clear public concern.

175.   Moreover, said complaints were made repeatedly in public forums such as public meetings accessible to members of the community and to the press at large, as well as to outside county, state, and federal authorities.

176.   Bensalem Township had a policy, practice, or procedure concerning workplace harassment and retaliation.

177. Bensalem Township further had a policy, practice, or procedure concerning employee discipline, including demotions and termination.

178. Bensalem Township finally had a policy, practice, or procedure concerning the investigation of suspected criminal conduct and the filing of criminal charges based on criminal investigations.

179. Despite these policies, practices, and procedures, and in derogation of them, Defendants Harran, Ponticelli, Monaghan and DiGirolamo retaliated against Plaintiff in his employment for engaging in the protected activity, terminating him (DiGirolamo and Harran), threatening him with beatings (Ponticelli), threatening him with arrest (Harran, Ponticelli, and Monaghan), ordering him not to speak (Harran, Ponticelli, and DiGirolamo), slandering his name (all), falsely prosecuting his son (Harran, Ponticelli, and Monaghan), ordering his car searched (Harran), ordering his home searched (Harran), ordering his wife stalked (Harran), and terrorizing his family (Harran).

180. Said adverse actions are sufficient to deter a person of ordinary firmness from exercising their speech rights and have the effect of chilling public reports of misconduct, waste, and illegality on the part of governmental entities and officials.

181. Said adverse actions were taken against Plaintiff only after he began protesting these Defendants' misconduct, illegality and waste, as well as while he was engaged in reporting it, and were accompanied by threats of arrest if he continued to speak publicly on these issues, as well as a threat to "take him out back" by Defendant Ponticelli.

182. Moreover, Defendants Harran, Ponticelli, and Monaghan specifically connected Plaintiff's forced resignation to their false and malicious prosecution of his son, without probable cause, claiming before the son was even charged that Plaintiff should resign

because "he'll be too busy defending his son" and telling him that if his son did not plead guilty they would arrest him too. Defendant Monaghan referred to the highly political nature of the prosecution and linked it to Plaintiff Jerri, Jr.'s connection to Union Fire Company and "the jerkoffs causing all the problems" there. They also made it a specific condition of stopping their retaliation against him that Plaintiff Jerri, Sr. resign as Chief.

183. Said conduct by Defendants Harran, Ponticelli, Monaghan, and DiGirolamo deprived Plaintiff of his speech rights.

184. Defendants Harran, Ponticelli, Monaghan, and DiGirolamo were acting under color of state law at the time they so deprived Plaintiff of his speech rights.

185. Each of the named Defendants either personally participated in these deprivations and violations of Defendants' policies, practices, or procedures, or had actual knowledge and acquiesced in said conduct (on notice, they both explicitly and tacitly sanctioned the one or more of the aforementioned retaliatory actions in response to Plaintiff's speech).

186. Defendant DiGirolamo was personally involved in: (a) initially receiving complaints from Plaintiff Jerri, Sr. of government misconduct and waste and the part of township officials; (b) thereafter cutting off direct access to himself by Plaintiff Jerri, Sr. who sought to voice his complaints of government wrongdoing; (c) appointing Defendant Harran to investigate and respond to Plaintiff Jerri, Sr.'s complaints *about* Defendant Harran himself and to head an "advisory board" despite allegations of his wrongdoing; (d) sanctioning Defendant Harran's gag orders on Plaintiff Jerri, Sr.'s ability to speak publicly; (e) directly participating in reinforcing the retaliatory defamatory impression meant to discredit, silence, and compel the resignation of Plaintiff Jerri, Sr. by terminating him from Union Fire Company in the midst of the created impression of

Plaintiff as unstable, incompetent, and dangerous; and (f) failing to remedy any of the retaliatory actions of Defendants Harran, Ponticelli, and Monaghan despite Plaintiff Jerri, Sr.'s complaints to him of their ongoing illegal conduct, and despite his knowledge of same.

187.   WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, equitable relief including reinstatement and restoration of employment, and any other equitable remedy that the Court deems reasonable and just.

COUNT IV-
Malicious Prosecution (state law claim)
**Plaintiff: David Jerri, Jr.**
**Defendants: Harran, Ponticelli, Monaghan**

188.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

189.   Defendants Harran, Ponticelli, and Monaghan of the Bensalem Township Department of Public Safety directed the initiation of a criminal proceeding against Plaintiff David Jerri, Jr., by way of filing a criminal complaint.  Defendants Ponticelli and Monaghan then attended a hearing on the criminal complaint they filed, pursuing it by presenting evidence and calling witnesses in support of it, and requesting that the charges be bound over for trial in the Buck County Court of Common Pleas.

190.   Defendants Harran, Ponticelli, and Monaghan initiated the criminal proceedings against Plaintiff David Jerri, Jr. without probable cause in that they knew that the evidence and testimony they presented in support of the charges was intentionally fabricated, unsubstantiated, and incomplete.

191.   Defendants Harran, Ponticelli, and Monaghan further failed to disclose exculpatory
       evidence to prosecutors, made false and misleading reports relied upon by prosecutors,
       omitted material information from their reports to prosecutors, exerted pressure upon a
       young and inexperienced prosecutor to argue charges ill-supported by facts and evidence,
       and otherwise interfered with the prosecutor's ability to exercise independent judgment.
       Most importantly, they just plain lied.

192.   Defendants Harran, Ponticelli, and Monaghan did so with malice; that is, Defendants
       intended that Plaintiff David Jerri, Jr. be both incarcerated on and convicted of crimes
       they knew he did not commit, based on evidence they knew was fabricated and
       withholding exculpatory information they knew was not, with the express intent of
       punishing his father for the father's opposition to their misconduct, waste, and illegality.
       Said malice against the Plaintiff was also for his father's reports of unlawful retaliation
       against him in his employment as Chief of Union Fire Company and against Plaintiff in
       his employment with Knights Collision Center, Inc.  Their conduct was therefore not
       motivated by justice, but rather was political punishment.

193.   Defendants Harran, Ponticelli, and Monaghan's conduct in presenting false and
       fabricated charges against Plaintiff David Jerri, Jr. fell outside of the scope of their duties
       as said conduct of knowingly prosecuting someone for a crime they did not commit is
       not, and cannot in anyway be said to be, the duty or office of these Defendants.
       Moreover, their actions themselves constitute criminal acts, fraud, actual malice and
       willful misconduct.

194.   The false and malicious proceedings instituted by Defendants Harran, Ponticelli, and
       Monaghan against Plaintiff David Jerri, Jr. terminated in favor of Plaintiff.  That is,

Plaintiff David Jerri, Jr. was acquitted of all charges against him following a waiver (bench) trial.

195.   Plaintiff was so acquitted by the Court despite the dogged efforts of Defendants Harran, Ponticelli, and Monaghan to frame him and knowingly present false and fabricated evidence out of the purely retaliatory and political motivations.

196.   Defendants' conduct was in violation of Pennsylvania law.

197.   WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, equitable relief including reinstatement and restoration of employment, and any other equitable remedy that the Court deems reasonable and just.  Plaintiff further requests a declaratory judgment issue against Defendants declaring their conduct unlawful, unbecoming of officers of the law, and in violation of Plaintiff's civil rights.

COUNT V-
Defamation (state law claim)
**Plaintiffs: David Jerri, Jr. and David Jerri, Sr.**
**Defendants: Harran, Ponticelli, Monaghan, DiGirolamo,**
**Knights Collision Center, Inc., and Michael Pierson**

198.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

199.   Beginning in about the fall of 2011 and continuing thereafter through November 2012, Defendants Harran, Ponticelli, and Monaghan, as well as Defendants Pierson and Knights Collision Center, Inc., publicly published statements casting Plaintiff Jerri, Jr. as a criminal and an insurance cheat, casting him as dishonest and untrustworthy, claiming that he falsely claimed injury while responding to a fire call and illegally collected workers compensation for the injury.

38

200.   Beginning in the summer of 2011 and continuing thereafter through November 2012, Defendants Harran, Ponticelli, Monaghan, and DiGirolamo also published statements about Plaintiff Jerri, Sr. and his employment that he was "mentally unstable," a danger to police officers, "incompetent," not competent to be Chief of Union Fire Company, and "a danger to Bensalem Township."

201.   Both sets of above statements were patently false.

202.   In fact, Plaintiff Jerri, Jr. never committed any such offenses and did not engage in any such activities or moral turpitude, while Plaintiff Jerri, Sr. was not mentally unstable, incompetent or a danger to the community.

203.   Defendants Harran, Ponticelli, Monaghan, DiGirolamo, Pierson, and Knights Collision Center, Inc. knew these statements were false, or recklessly disregarded their falsehood, yet made them anyway, being politically and personally motivated to retaliate against the Jerri family for Jerri, Sr.'s protected speech activity implicating Defendants Harran, Ponticelli, Monaghan, and DiGirolamo in waste, illegality, and wrongdoing.

204.   Said statements were also not privileged.

205.   Said statements were made with the specific intent that others to whom they were made would act against the interests of Plaintiffs, namely, that Plaintiff Jerri, Jr. would be prosecuted and convicted of crimes he did not commit and that his coworkers, peers, public, and potential future employers would impute upon Plaintiff Jerri, Jr. criminal wrongdoing, dishonesty, and other moral turpitude for reasons that were not the truth. With respect to Plaintiff Jerri, Sr., said statements were made with the specific intent that the defamatory impression would be used to force him from his position as Chief of Union Fire Company and that his coworkers, peers, public, and potential future

employers would impute upon Plaintiff mental instability, incompetency, dangerousness and moral turpitude for reasons that were not the truth.

206.   Said statements were in fact taken as intended by others who, as a result of the defamatory statements, took action to ostracize, demote and terminate Plaintiffs from their employments.  Said statements also substantially affected others' perceptions and ability to work with Plaintiffs within the community in which he lived and worked, being passed among co-workers, friends, colleagues, and employers.

207.   As a result of these Defendants' statements, Plaintiffs suffered harm including the damage to their reputation, immense emotional and mental distress, public embarrassment and humiliation, and economic damage as Defendants' statements were used to demote Plaintiff Jerri, Jr., terminate his private employment, revoke his workers compensation benefits, incarcerate him, publicly humiliate him, and otherwise impede his ability to earn a living, and were used to force Plaintiff Jerri, Sr.'s resignation, destroy his credibility, and otherwise impede his ability to earn a living.

208.   The conduct of Defendants Harran, Ponticelli, Monaghan, DiGirolamo, Pierson, and Knights Collision Center, Inc. was in violation of Pennsylvania law.

209.   WHEREFORE, Plaintiff demands compensatory and punitive damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, and any other equitable remedy that the Court deems reasonable and just.

COUNT VI-
Intentional Infliction of Emotional Distress (state law claim)
**Plaintiff: David Jerri, Sr.**
**Defendants: Harran, Ponticelli, Monaghan, and DiGirolamo**

210.   Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

211.   Beginning in the summer of 2011 and continuing thereafter through November 2012, Defendants Harran, Ponticelli, Monaghan, and DiGirolamo published statements about Plaintiff and his employment that he was "mentally unstable," a danger to police officers, "incompetent," not competent to be Chief of Union Fire Company, and "a danger to Bensalem Township."

212.   These statements were patently false.

213.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo intentionally published these statements knowing they were false, or recklessly disregarding their falsehood.

214.   Defendants Harran, Ponticelli, and Monaghan also retaliated against Plaintiff by falsely and maliciously targeting his son with prosecution, stalking his wife, stalking his sons, and otherwise striking fear in the Jerri family.

215.   All these Defendants thereby acted intentionally, or through reckless disregard of the truth acted recklessly, with respect to the harm these statements and retaliation would cause Plaintiff both mentally and emotionally, being politically and personally motivated to retaliate against he and his family for his engagement in protected speech activity implicating Defendants Harran, Ponticelli, Monaghan, and DiGirolamo in waste, illegality, and wrongdoing.

216.   Said conduct did in fact cause Plaintiff mental and emotional distress.

217.   Said mental and emotional distress was severe.  Plaintiff suffered emotional harm of a severe and devastating nature as a result of Defendants' conduct as he was threatened with arrest and a beating, watched his wife and son be stalked by unknown persons, watched as his family struggled and suffered, listened to the fears and questions of the children in his life, saw his name plastered on a Wanted poster outside his work, heard the jokes, was ridiculed and humiliated, watched as his son was falsely prosecuted, lost his reputation, and ultimately lost his job as Chief, all because he reported and complained of the actions of Defendant DiGirolamo, Harran, Ponticelli, and Monaghan.

218.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo's conduct in so retaliating against Plaintiff for his protected activities by terminating him, falsely accusing his son of fraud, dishonesty, and criminal conduct, fabricating witnesses and evidence, plastering an interstate with his son's picture as "Wanted" to humiliate him, incarcerating his son, stalking his wife and sons, invading their home with small children present, and publicly embarrassing, humiliating, and lying about him was both extreme and outrageous.

219.   Said conduct goes beyond all possible bounds of decency and is intolerable in a civilized society.  No one in society would tolerate being falsely accused of these things and incarcerated on them; no one would find such willful misconduct by police officers out of political and retaliatory animus anything less than outrageous, even those who live with it in Bensalem and know these Defendants.

220.   The conduct of Defendants DiGirolamo, Harran, Ponticelli, and Monaghan was in violation of Pennsylvania law.

221.   WHEREFORE, Plaintiff demands compensatory and punitive damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an

award of attorney fees and costs, and any other equitable remedy that the Court deems reasonable and just.

COUNT VII-
Conspiracy (state law claim)
**Plaintiffs: David Jerri, Jr. and David Jerri, Sr.**
**Defendants: Harran, Ponticelli, Monaghan, DiGirolamo,**
**Knights Collision Center, Inc., and Michael Pierson**

222.  Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

223.  With respect to each of the above state-law causes of action, Defendants Harran, Ponticelli, Monaghan, and DiGirolamo (as to both Plaintiffs), along with Knights Collision Center, Inc. and Defendant Pierson (with respect to Plaintiff Jerri, Jr.), conspired and agreed to deprive Plaintiffs of their constitutional liberty interests and to commit torts against them.

224.  Specifically, they reached an agreement to deprive Plaintiff David Jerri, Jr. of his physical liberty by falsely arresting and maliciously prosecuting him for a crime they knew he did not commit, doing so publicly to humiliate, embarrass and retaliate against he and his father.  Defendants additionally agreed to deprive Plaintiff David Jerri, Jr. of his liberty interest in his reputation by creating and disseminating a false and defamatory impression of him publicly.

225.  Defendants Harran, Ponticelli, Monaghan, and DiGirolamo also reached an agreement to deprive Plaintiff David Jerri, Sr. of his reputation in the community and of his employment as Chief of Union Fire Company, maliciously prosecuting his son for a crime they knew he did not commit in order to force his resignation, and doing so publicly to humiliate, embarrass and retaliate against him by creating and disseminating a false and defamatory impression of him publicly.

226.   After agreeing to take these actions, they took them, framing Plaintiff Jerri, Sr.'s son very publicly, fabricating witnesses and evidence, incarcerating him for a crime he didn't commit, securing his demotion and termination, humiliating him publicly, and leveraging it over Jerri Sr. while engaging in a campaign of defamation against him as well, all in retaliation for his reports of Defendants' unlawful misconduct, waste, and illegality.

227.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo acted maliciously with the purposeful intent to injure both Plaintiffs, while Knights Collision Center, Inc. and Defendant Pierson joined them in acting maliciously with the purposeful intent to injure Plaintiff Jerri, Jr..

228.   Defendants Harran, Ponticelli, Monaghan, and DiGirolamo acted under color of state law, initiating criminal legal proceedings and arresting Plaintiff Jerri, Jr. via power possessed by virtue of state law and made possible only because Defendants are clothed with the authority of state law.  They disseminated false and defamatory statements about Plaintiffs via power possessed by virtue of state law and while clothed with the authority of state law.

229.   As a result of these Defendants' conduct, Plaintiffs were harmed economically, emotionally, mentally, and in their reputations.

230.   Said conduct was in violation of Pennsylvania law.

231.   WHEREFORE, Plaintiffs prays for the following relief: Plaintiff demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, equitable relief including reinstatement and restoration of employment, and any other equitable remedy that the Court deems reasonable and just.

COUNT VIII-
WRONGFUL TERMINATION FOR SEEKING WORKERS
COMPENSATION IN VIOLATION OF PUBLIC POLICY
**Plaintiff: David Jerri, Jr.**
**Defendants: Knights Collision Center, Inc. and Michael Pierson**

232.  Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

233.  Plaintiff Jerri, Jr. exercised his statutory right under Pennsylvania law to file for Workers Compensation benefits following his injury at a fire call on September 17, 2011.

234.  Defendants were aware of Plaintiff's injury and his seeking of workers compensation because: (a) he told them, and (b) the claims adjuster for the workers compensation claim informed them as well.  Moreover, in sworn testimony, Defendant Pierson (the owner of Defendant Knights Collision Center) admitted this and admitted removing Plaintiff from the schedule for exactly this reason.

235.  Plaintiff's activity of filing for Workers Compensation benefits was protected by law in the Commonwealth of Pennsylvania.

236.  Thereafter, Defendants retaliated against Plaintiff in his employment by falsely accusing him of "abandoning" his job and of not being truly injured, and terminated him while he was collecting Workers Compensation and before he was medically cleared to return.

237.  Prior to Plaintiff's seeking Workers Compensation and obtaining it, Defendants never expressed any intention to terminate Plaintiff.

238.  Defendants only moved to terminate Plaintiff after he told them he could not work and was receiving Workers' Compensation due to an injury sustained during a fire call as a volunteer firefighter.  Defendants claimed he "abandoned his job."

239.  Said termination was in direct retaliation for Plaintiff's activity of seeking and obtaining Workers Compensation benefits under Pennsylvania law.

45

240.   Between the time Defendants were informed of his workers compensation claim and the time they terminated him, no other intervening event had occurred as Plaintiff was out of work for the whole period being treated medically and receiving payments for workers compensation.

241.   Said conduct by Defendants of firing Plaintiff for seeking, and while out on, workers compensation undermined, threatened, and was in violation of a clear mandate of public policy in the Commonwealth of Pennsylvania as recognized in <u>Shick v. Shirey</u>, 552 Pa. 590, 716 A.2d 1231 (1998); <u>See also</u> <u>Rothrock v. Rothrock Motor Sales, Inc.</u>, 883 A.2d 511 (Pa. 2005).

242.   Said conduct penalized Plaintiff for exercising a lawful right to seek and obtain workers compensation.

243.   Said conduct would reasonably and objectively chill and discourage the filing of workers compensation claims by promoting fear in potential claimants of termination by Defendants in retaliatory response.  It would also chill the activities of volunteer and paid firefighters who fight fires for the community but must depend on other employment as their primary source of income.  It does so by forcing said firefighters to choose between fighting fires and ensuring their own livelihood should they be injured, sending a clear message that they risk their jobs if injured while serving the public.

244.   Said conduct by Defendants did, in fact, harm Plaintiff in his employment by terminating that employment, causing him economic, reputational, emotional and mental harm.

245.   WHEREFORE, Plaintiff demands compensatory and punitive damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an

award of attorney fees and costs, equitable relief including reinstatement and restoration

of employment, and any other equitable remedy that the Court deems reasonable and just.

COUNT IX-
WRONGFUL TERMINATION OF VOLUNTEER FIREFIGHTER
IN VIOLATION OF 35 Pa.C.S. § 7424 (formerly part of 43 P.S. § 1201 ET. SEQ.,
"An act prohibiting employers from firing employees who lose time from employment
in the line of duty as volunteer firemen and providing penalties")
**Plaintiff: David Jerri, Jr.**
**Defendants: Knights Collision Center, Inc. and Michael Pierson**

246. Plaintiff incorporates herein the previous averments as if fully set forth in this paragraph.

247. Plaintiff is a volunteer fireman and has been for over nine years.

248. Plaintiff responded to a fire call as a volunteer firefighter on September 17, 2011 and was

injured in the line of duty.

249. Plaintiff responded to said call and was so injured prior to the time he was scheduled to

work next for Defendants, resulting in a loss of time from his employment.

250. Plaintiff exercised his statutory right under Pennsylvania law to file for Workers

Compensation benefits following his injury, and informed Defendants of such.

251. Defendants were aware of Plaintiff's injury while on a fire call and his seeking of

workers compensation because: (a) he told them, and (b) the claims adjuster for the

workers compensation claim informed them as well.  Moreover, in sworn testimony,

Defendant Pierson (the owner of Defendant Knights Collision Center) admitted this and

admitted removing Plaintiff from the schedule for exactly this reason.

252. Subsequent to Plaintiff's response to the fire call, injury, and application for and receipt

of workers compensation benefits, Defendants terminated Plaintiff for "abandoning" his

job before he was medically cleared to return to work.

253.   Plaintiff's activity of responding to a fire call as a volunteer fireman was protected by law in the Commonwealth of Pennsylvania, as was his return to work without termination or other discrimination after losing time due to an injury he sustained during the call.

254.   Prior to Plaintiff's injury while responding as a volunteer fireman to a fire call, Defendants never expressed any intention to terminate Plaintiff.

255.   Similarly-situated employees who missed time due to a work-related injury, but who were not volunteer firefighters in Bensalem, were not terminated for their injuries.

256.   Said conduct undermined, threatened, and was in clear violation of Pennsylvania law and public policy and would reasonably and objectively chill and discourage the activities of volunteer firefighters who fight fires for the community but must depend on other employment as their primary source of income.  It does so by forcing said firefighters to choose between fighting fires and ensuring their own livelihood should they be injured, sending a clear message that they risk their jobs if injured while serving the public.

257.   Said conduct by Defendants did harm Plaintiff in his employment by terminating it.

258.   Defendants' conduct was in violation of Pennsylvania law, namely 43 P.S. § 1201 et. seq., entitled "An act prohibiting employers from firing employees who lose time from employment in the line of duty as volunteer firemen and providing penalties."

259.   WHEREFORE, Plaintiff demands the relief specified by statute including reinstatement, compensatory damages in the form of all lost wages and benefits for the period between termination and reinstatement, all reasonable attorney fees and costs, and any other equitable remedy that the Court deems reasonable and just.

<u>PRAYER FOR RELIEF</u>

260.   WHEREFORE, Plaintiffs requests all relief available under the law, including but not

limited to: (a) Compensatory damages for Plaintiffs' economic injuries; (b) Attorney fees,

litigation expenses and all allowable costs with interest; (c) Unlimited compensatory

damages for Plaintiffs' non-economic injuries, including mental suffering and emotional

anguish; (d) Punitive damages for Defendants' malicious and recklessly indifferent

actions in harming Plaintiffs; (e) A decree awarding Plaintiffs further appropriate

equitable, declaratory and injunctive relief; (f) Expert witness fees with interest; (g) A

trial by jury is demanded.


By:

/s/ Brian K. Wiley_____
Brian K. Wiley, Esq.
PA ID#55813
Counsel for Plaintiffs

The Law Office of Brian K. Wiley, Esq., P.C.
100 South Main Street
North Wales Pa. 19454
(215) 699-2522
(215) 699-8988 Fax
bkwlaw1@verizon.net

Dated: September 11, 2013